Today is 22-2281 Caraway v. City of Pineville. Mr. Littlejohn. Thank you, Your Honor. May it please the court, Attorney Michael Littlejohn, and I'm here on behalf of appellant, Mr. Timothy Caraway. This is the case of Timothy Caraway, who in February of 2020 was shot at 12 times by officers of the Pineville Police Department. Of 11 of which, 11 of those shots that came after Mr. Caraway hit the ground like a sack of potatoes. Today, we are asking that this court reverse and remand the district court's opinion. What I would like to do first is discuss the facts that we believe are in dispute and elaborate as to whether the trial court resolved any of these disputed facts in reaching its decision. Essentially, whether or not the lower court's opinion went outside the mandate of the summary judgment rule. Let me ask you this, sir, before you get started. This case was resolved pursuant to a summary judgment motion, correct? Yes, sir, Your Honor. And in the context of making that summary judgment determination, the trial court made certain factual determinations. Would you agree with that? Yes, sir, Your Honor. In the context of a summary judgment, all of the consensus facts are to be viewed in favor of the non-moving party, correct? Yes, sir, Your Honor. And in this case, there were in courts, in this court, this judge's view, several disputed facts. Do you believe that the case should be resolved based upon a standard of review or an inquiry of the facts? Your Honor, today, I would ask that this court review, the standard of review is de novo with respect to the summary judgment and the qualified immunity. At the lower court, the movement must show that there was no genuine dispute of material fact and is entitled to a judgment of law. In this court's review, we would ask that this court draw all of this to care away. And did the district court do that? It is our position that the district court did not do that. Can you point to those disputed facts that you believe justify your perspective of the case? Yes, sir, Your Honor. First, I would like to start with the fact that Officer Gladden, and just to give this perspective, as I know we are supposed to look at these cases in the totality, right? Four total officers of the Pineville Police Department. Most notable here, the two officers that the court should be aware of is Officers Roberts and Officer Griffin. Those are our two shooting officers. But to get back to your Honor's question, number one is that Officer Gladden, who was not one of the shooting officers, he saw a dark object in Mr. Carraway's right hand and commended him to drop the gun. We also have in this record, Your Honor, two civilian eyewitnesses. Eyewitness number one, Kevin Strudwick, who stated that he was about 15 feet away from Mr. Carraway at the time of the shooting. He did not see a weapon whatsoever in his hand. We also have civilian eyewitness, James Penniston, who stated at no point did he see a weapon in his hand. We also have officer... Mr. Littlejohn, I think that's, I think you're right. But the question is what did Officer Gladden think? You're not, you said he may have been mistaken. Obviously he was, because it appears that what your client had in his hand was the phone, not a gun. But the question is whether it was reasonable for that officer to think that what he had in his hand was a gun, given that the call that came into them was a call about a man walking down the street with a handgun or pointing a handgun at people. So why would that have been unreasonable? Or you tell me what you, what were to make of that? What should we make of the fact that he thought your client had a gun in his hand? With respect to that, Your Honor, you know, his subjective, you know, thoughts, his subjective intent, it would, the way that this standard is supposed to be looked at is through a reasonable, objective officer who was at the scene at the time. Well, why wouldn't that have been reasonable? Well, at the time that Mr. Carraway was shot, Officer French, who was the lead or point of contact on that, on that particular day, he was the officer that was closest to Mr. Carraway. He could see Mr. Carraway's hands. He could see Mr. Carraway's movements. Officer French stated that it was clear that Mr. in his hand and that he had his hands up and that when officers arrived on scene, he was walking with his hands down by his side. How did he get the gun in his hand? There's a picture of him with a gun kneeling with the gun in his hand pointing at the officers in his right hand. The cell phone was in his left hand and the gun was in his right hand and some officer said, drop the gun at about a 49 seconds or 48 seconds. At 50 seconds, there is him kneeling with the gun in his right hand pointing at the officers and at 51, he's down on the ground. The gunshots were 3.5 seconds. It was a burst simultaneous. If you watch it at full speed, it goes and that ends it. Nine bullets from Griffin and three bullets from Roberts. And I thought we don't know which ones were fired before or after. We do know that the opinion was that two hit him while he was on the ground and two hit him while he was above kneeling. And that's what somebody concluded, but I don't know if that makes any difference. The truth of the matter is if you watch the film and I can tell you, I spent 45 minutes an hour looking at this film repeatedly trying to figure out and it just happened so fast. It's hard to tell the sequence in fractions of a second, but they did conclude that the total burst of gunfire was simultaneous and 3.5 seconds. And the question is, if they were entitled to fire the first or second shots, at what point do you tell them they have to stop? An officer did tell Griffin to stop and he stopped. And of course the guy was on the ground and I'm absolutely sure, at least from the evidence, that a couple of the bullets at least hit him while he was on the ground, but he was hit four times, right? They said two while he was up and two while he was on the ground. Twelve times. Yes, sir. He was hit four. He was, he was, yes, he was, he's just, there were, there were 12 shots fired, nine from Griffin's gun and three from Robert's gun. Nine from Griffin. Yes, yes, nine from Griffin and three from Robert's gun, yes sir, your honor. And they came out, the noise on the thing is simultaneous. You can't hear the difference. It's sort of like a, I tried to count the seconds several times and I got up to three. The experts said it was 3.5 seconds, but it was a single burst of gun and he was kneeling when the first guns were filing yet with that position. He had fallen on his knee with his gun in his hand and the cell phone was in the grass and lying in the grass when they got there over to the side. He had the cell phone in his left hand when the French, I don't know that, anyway, I'm just wondering, you know, we're parsing this by fractions of a second and it's very, very difficult. And I would say your honor, I can guess some of this, fortunately the man lived and, and of course they rushed to give him medical attention right away. There, there was not a mens rea that they were trying to punish him. They, at least I didn't see that. Yes, your honor. And I would say as soon as he was shot, yes, this is unfortunately not one of those cases that we've seen that this court has reviewed where there's been numerous deaths. But going back to, you know, how I guess you saw the video. I would ask the court to also refer to the investigative report that if you look as the investigative report, it does screen snaps of that interaction and during that interaction as he's hand, left hand is in the air and he's on his knees. The gun is not pointing towards officers. You see his hand clearly being extended, which is what I thought and that's what I thought the police report said that he, they had a closeup of him on his knee with the gun in his right hand and in the direction of the officers and they did a blow up of that, which I thought was helpful. Yes, your honor. And so in the blow up that you, that you see, yes, he is going to take a knee. And again, I would like to recall that the Mr. Strugwick who was right there said that he was getting on the ground, you know, and then he received a gunshot wound and he fell to the ground. That's when the shots keep going. But if this court, I would like to refer it to the Joint Appendix 599. And this was when Officer French was being interviewed about the incident and he was asked is if he made a movement of aiming or pointing the gun towards officers, which Officer French responded and said, well, when it came out of his I remember raised it as far as I remember, he didn't bring it up to shoot. That's Joint Appendix 599. Okay. You have six people, seven people looking at the same incident. You know, when I was in law school, the first year of law school, the Dean of the law school said, we're going to show you a film of a holdup and then afterwards, we're going to ask you questions about it. He showed the film of the holdup and we're all paying attention to it. And then we were given a questionnaire and asked questions. The class was all over the place. But what it demonstrates is that everybody sees things. They try to make the best they can of it, but it's all so fast happening. I think everything here happened within a period of about four or five seconds. And it was a total time was 40 from 43 to 52 or so. It's about nine seconds when they first talked to him, but I'm the actual use of force was about three to four seconds and he was not on the ground when they started with the gun of fire because he was on his knee at that point. I was at 350 and the first you see smoke coming from Robert's gun on 350. Yes, and I would say, Your Honor, there was a break in events here. I believe that this case presents no break in those. The gunfire was continuous. Just a short spurt of three and a half seconds. And, Your Honor, it would be our position. If you look at the video, as soon as Roberts takes the very first shot, and if you stand, right, right. And then as Officer Frencheson. We don't know whether Roberts first shot. What we do know is smoke from Roberts gun was seen at 52nd moment at the .50 on the tape. But the only reason they identified at 350 is because they see the smoke from his gun. But I think the gunfire seems to maybe a second before or two seconds before and and maybe two seconds after the 350 mark. He went down at 350. He was on his knee at 350, not 350, just 50. I don't know what this is. Yeah, that is correct, Your Honor. And then he was down. But it happened pretty quickly. Right. So the first shot was at 1506.50. That's what you're referring to. Well, yeah. I think they say the first shot, but the only reason they say that is because they see that they don't see any smoke from Griffin's gun. They see some smoke from Roberts gun and that's at 350. And I do want to continue to address Judge Alston's initial question. Some of the other, you know, issues of fact here that came up is that, you know, this distinction that he suddenly withdrew his weapon. It is our position that, at all times relevant, Mr. Carraway, he complied with officer's commands. He was given inconsistent instructions. He was told to get on the ground, raise his hand, and don't use the weapon. So one suggestion seems counterintuitive to the other thing that he might be trying to do. So he was being given inconsistent instructions. And we saw that also consistent with the Franklin case, where Officer Curl, in that case, had given inconsistent commands. And the only way, when you tell someone to drop a weapon, and they do not have a weapon in their hand, and they have both hands up, and there's only a cell phone in that hand, that the closest officer sees is in his hand. Okay. So, and you're right about that. But let me ask you about that. So that's right. And you pointed out that the fact that there may have been some evidence that the, well, that the district court made a finding with respect to the gun being pointed at the officers. And you say that that's disputed, and that there's evidence to the contrary. But I want to go back to the earlier scenario I mentioned, and that is, you've got a person walking down the street, police officers receive a report that he had pointed a gun at somebody. So they know, or they believe, that he's armed. They show up, they see a black, shiny object in his hand, which one officer believes, apparently mistakenly, that it's a weapon. That same officer then says, drop the gun. And in response to that, your client tries to comply. But what he does is he puts his hand in his pocket and he pulls out a gun. And so now you've got the officers thinking, well, looks like he's got two guns. And whether he's pointed or not, the district court, in response to that, says that Roberts and Griffin were not expected to wait to find out if, after removing his firearm, plaintiff merely intended to drop it. Neither were the officers expected to know whether plaintiff only removed it to comply with their commands. His subjective intent is irrelevant. What's wrong with that? Your Honor, I am over time, if I may respond. Absolutely. Yes, and again, looking at this in its totality, I do want to start with that dispatch call. We have a call from an anonymous 911 call from someone who claims that they have seen an African-American male with dreadlocks, with a tan jacket, pointing a gun at a car. As the district court also found that, and my client stated in his deposition, that he had pointed a gun at a car, who the driver was pointing a gun at him, demanding him to get in the car, which he did not. He continues to leave... The officers knew, they didn't know any of that. Correct, Your Honor. And when they arrive on scene, what did they see? They see a black man with dreads and a tan jacket, not committing a crime. He had not committed a crime that day. And so as officers then stealthily come behind him, and as you can hear in the body-worn camera, I have my rifle ready. It is at that time that officers are giving different commands. And when I say conflicting commands, it's commands to drop a gun that is not in your hands. And so in order for him to retrieve said gun, he's going to get shot. If he were to not try to retrieve said gun, you know, he could be shot as well. And again, when you're being told to, let me see your hands, let me see your hands, hands up, get on the ground, drop the gun, drop the gun. I mean, that put Mr. Carraway into a very precarious situation. But just to answer your Honor's question, and I'll leave it there, if you have any additional questions, Your Honor. All right. Thank you, Mr. Littlejohn. Mr. McClatchy. Good morning, Your Honor. Scott McClatchy on behalf of the defendants appellees. May it please the Court, I would like to respond to a few of the points that Mr. Littlejohn made to Your Honors just now. One of the first things he said was 11 of the 12 shots were fired at Mr. Carraway after Mr. Carraway was on the ground. I would submit to the Court that is contrary to Mr. Carraway's testimony. He testified at deposition, and it's in the Joint Appendix at pages 261 to 262. Quote, I remember letting go of the gun. I remember getting hit, I think in the shoulder first and then maybe the neck, and then I just remember hitting the ground. Once I hit the ground, the shots were still going off. I got hit twice on the ground. One very big point that was discussed and raised by Mr. Littlejohn was the manner in which the gun was being held. Mr. Littlejohn referred the Court to the Joint Appendix particularly, and it is page 599 of the Joint Appendix, and this is Sergeant French. This is Sergeant French's interview with the SBI shortly after the incident. Plaintiff characterizes that there is a dispute as to how the gun was held. There is no dispute, and here's why. Here's what Sergeant French said. Well, when it came out of his pocket, it was like that. Now, he never raised it, as far as I remember. He didn't bring it up to shoot, and obviously in law enforcement training, military, there's a shooting stance with the arm fully erect, and there can be a lower shot called a hip shot. So he said he never raised it. He didn't bring it up to shoot, but when it came out, you could shoot just as easily right here as you can anywhere else. When it came out, it was pointing towards us. Mr. Carraway, in none of his evidentiary submissions to the District Court, offered one iota of evidence or testimony insisting that the gun was never pointed at officers. What they did offer was testimony from civilian witnesses at a nearby business who never even saw a gun, period. So their testimony is certainly not informative of how it was pointing. This court back in, I think, 2001, 2002, in Anderson v. Russell, in affirming summary judgment for the police in a shooting case of what ended up being an unarmed person, commented how civilian witnesses and their viewpoint may be helpful except where they don't have the sufficient viewpoint, and we know that here because it's undisputed. Let me ask you this, counsel. Yes, sir. This case was resolved pursuant to a motion for summary judgment. That is correct. Which suggests that there are no genuine issues of material fact. That is correct. In the Nibs case in this circuit and in the Franklin case, in particular in the Franklin case, the court said that the focus is on the imminent threat and noted that one cannot help noticing that the intensity of the situation emanated not from Franklin but from the volume and vigor of the officer's commands. The Fourth Circuit also focused on the fact that whereas here Franklin's gun was concealed under his jacket, not in his hands, so the only way for him to obey the officer's commands to drop the gun was to reach into his jacket to retrieve it, and ultimately the Fourth Circuit held that a reasonable juror could find that the officer's actions were unreasonable. How do you distinguish that case from this case? Well, very, in a couple ways, Your Honor, if I may, please. First of all, it's in the record and because it's in the audio, we know what the commands were. And there were a total of 1, 2, 3, 4, 5, 6, 7. The only command that was given by either of the two officers who in that split-second judgment made the decision to shoot, the only command was Roberts. Griffin, who also shot and never gave a command, it was Roberts. And what was Roberts' command? One of the first ones, let me see your hands. And Mr. Carraway complied with that. Contrast that to the Franklin case. Officer Wendy Curl, who spent 43 seconds screaming commands at a man where she not only not saw a gun, she didn't even see any object in his hand. And at that point when he reached in slowly and grabbing a handgun by the stock or the top of the gun, excuse me, with the barrel pointed away from officers, attempted to discard it. Now, the second part of my response to Your Honor's question is the notion that a reasonable juror could find. Well, here we have facts that are not in dispute. The fact of how he removed it, which was quickly, the plaintiff argues a lot in their brief. Oh, well, he came out slowly. He was complying. There's no affirmative evidence in the record of that. Not a single word of testimony from the plaintiff. In fact, in their opposition, excuse me, their reply brief, or excuse me, their opening brief, they put in, and in the district court, they put in Mr. Carraway's entire deposition testimony. Yesterday I did a word search. The words slow or slowly as it relates to his removal of the gun appear nowhere. So what we have are two red herrings here camouflaged as factual disputes, which are slowly versus quickly, and whether the gun was pointed at the officers. Why should we then discount the perspective of the private citizens who have no fight in the matter? Because the plaintiff saw a firearm at all, which merely goes to the point that their perspective or their vantage point was such that they were in less of a position than these officers who were facing him head on. We do not, or I would say the job, I believe, of a court, of a reviewing court, would not be, as one circuit said, not the fourth, but it's in our reply, or in our appellee's brief, pick and choose inconsistencies from what the plaintiff is saying, perhaps from other witnesses, to try and say there's a dispute. There's no dispute here. He produced it. He has never said he did it slowly. He never said I didn't point it. There is plenty of testimony from the officers that it did come out quickly, and I think the video confirms that. And the video also would confirm that as it came up, even for a split second, Your Honor, it was pointed. And my final point I wanted to get to in response to your question of, well, couldn't a reasonable jury conclude, this court has on several occasions, including one, I think, very important decision, I believe Judge Diaz was the author earlier this year, Putnam v. Harris, said whether the force used was excessive is a question of law. And in addressing a statement by the district court that perhaps whether an officer had a reasonable enough belief to use the force that the officer did, that that's a factual dispute for a jury, what this court said in Putnam v. Harris is the conclusion that the facts are in dispute as to whether an officer had a reasonable belief, that is not necessary, because where the material facts are not in dispute, there's no need for a credibility decision by a jury. Here, Your Honor, slowly versus quickly, gun pointed at the officers, there is zero affirmative evidence in the record from the plaintiff that contradicts the testimony sworn by declaration and given immediately after the fact to the SBI about the quickness with which the gun came out. And remember what Sergeant French said. He didn't get it all the way up into a shooting stance, probably because, yeah, he was trying to get it out and throw it. In fact, Your Honors... Wouldn't the reasonableness of the force that was used be affected or implicated by the fact that apparently, according to the video that I saw, the officers continued to shoot Mr. Carraway after he'd already gone down? If, as Judge Niemeyer said, if you go frame by frame and you slow it down to that level, you can see some pings, some ricochets nearby that shows rounds were hitting the ground around him. I think we could all agree that the evidence is that rounds continue to be fired. But as case law we cited in our brief indicated, is it reasonable to parse that? This was, in Judge Niemeyer's characterization, a single burst. 3.5 seconds and it's over with. The fact that he, within that period of time, managed to drop the gun, go on the ground, and a few more rounds are still being fired is not the, to use the words of Waterman versus Batten, the break in the action within which a reasonable officer would realize, okay, we need to stop. We have a reasonable officer here and one that said, stop shooting. At least one of the officers commanded the people to stop shooting. So at least that reasonable officer was of the view that we don't need to shoot a person who's down on the ground. And that officer was the one closest to Mr. Carraway. If Mr. Carraway was here, turning facing that was Sergeant French on the sidewalk, looking right at him, Sergeant French seeing him go down, seeing that the gun was no longer there, hearing the last few shots over here, said stop firing, which was repeated by Officer Gladden in the street, stop firing, at which point Officer Griffin fired no further shots. Can I ask you to respond to the statement that Mr. Littlejohn made near the end of his argument that there was a call about someone pointing a gun at another person. He says that in fact, it was because a gun had been pointed at his client. But by the time the officer showed up, the event was over and that this just ramped up far too quickly. And that's, you know, that to react in the way the officers did. Well, Your Honor, my response to that would be consistent with my own law enforcement training, my work on these Section 1983 cases over the decades, is that ultimately, the question of the reasonableness of force is based upon, it's an action-reaction. Had they just arrived on scene, given voice commands, and Mr. Carraway turning around and they're saying drop, drop the gun, this is a cell phone and prone on the ground. Instead, he apparently tossed it to the side and in one fell swoop, comes out, at least at this level, pointed towards them. And that's when an officer here and an officer here shot. The notion that somehow the force could be less justified had they maybe had time or the luxury of time, which they didn't here, but to tactically set up, had it been more of what we call a static versus dynamic force encounter and they'd had time to stage and strategize. That's not what we had. The case law is clear and I can think of no example better than the United States Supreme Court in the 2015 decision of Sheehan v. City and County of San Francisco, which dealt with a mentally stressed, it was a person under mental duress, barricading themselves in the bathroom and the police were coming in, you come in, I'm going to whatever, and ultimately they forced the door and there was a lunge, I think there was a knife, and there were gunshots. And of course the criticism was, well, couldn't the police have postured themselves or set themselves up better beforehand? And the majority decision in Sheehan said effectively the fact that the plaintiff can come into court, in that case with an expert opinion, which we don't even have here, articulating that the police could have positioned themselves better or could have taken steps tactically that would have forestalled and prevented this later I believe irrelevant. We are looking at the quintessential, as I said in the brief, split second judgment call in circumstances that are tense, uncertain, and rapidly evolving. And that's a direct quote from the Supreme Court's 1989 Graham decision. Taking advantage of your expertise and knowledge is the way police work and I respect that. My father was a police officer, so I understand where you're coming from. But in the situation that was presented, what was Mr. Carraway supposed to do when he was being given inconsistent instructions as to how to handle the situation? I have, Your Honor, I can't get into Mr. Carraway's head. I would think when first time I went through this and I went through it again, I thought, wait a minute. If I had just pointed a gun at a car and now I know the police are behind me and they're saying, get your hands up, and I hear someone say, drop the gun, I'm going to be, it's my phone, drop it and I'm going to drop down. I've been taken out when I was an employee around in the time of college. I worked in a liquor store. The silent alarm went off, unknown to my knowledge, in Los Angeles. Next thing you know, I got LAPD officers pulling in. I've got shotguns pointed at me and they're getting out. I could have like, well, I didn't do anything and, you know, I complied to the T. The police are not expected to know what is in, as the case law says, the heart or mind of the person they're confronting. So can I, so sorry to interrupt, but he could have done that. That's fair. But I guess the judge Alston's point is he's told to drop the gun. And of course he does. He literally complies by trying to get the gun out of his pocket and dropping it. Now, you may think in hindsight that was unreasonable, but that's the concern here. But I guess the response to that is, what are the officers supposed to make of that action? Well, and, and, and you're, and, and Judge Dias, you, this points to a parallel or a, one of those lack of similarities to the Franklin case, which Judge Alston mentioned earlier on. In the Franklin case, it was apparent the person was just trying to disarm. But the difference there, and if there was any confusion by Mr. Franklin that brought on that shooting, it came from Officer Wendy Curl, because she was the one giving him the order to do this for 43 seconds. And when he finally did it, she shot him. Here, Officer Roberts, between him and Griffin, the only two who had that perception of a deadly threat and took action, neither of them said anything to the effect of drop the gun, put him down, get on the ground. They said nothing. If, and again, we have to look at their behavior. They did not cause any confusion, because all that Officer Roberts said was right at the front end. Sergeant French said, hey, man, get your hands up. Roberts said, let me see your hands. After that, neither of the two officers who shot said anything. So it is indeed unfortunate if Mr. Carraway and a reasonable person in his position would have been confused. But the named defendants here who were being sued for violating his civil rights, shooting him did not cause any of that confusion. Isn't it true that the officer who first fired was on probation or being trained or something like that? He was a seasoned officer. And it's in the record, Your Honor. It's in the joint appendix at the beginning of his declaration. He had been a police officer for, gosh, was it the city of Hickory or the city of Statesville? One of the officers was in training or something. That's the one. It was Griffin. And you see, Griffin had recently moved to the Charlotte area, as he states in the beginning of his declaration, to be near family. But he had already served several years as a full-time street patrol officer in Statesville or Hickory. When he lateraled, as the expression goes, he lateraled to Pineville, they still put him with a field training officer, an FTO, for a few months just to obviously assess him and make sure he knew their procedure, became familiar with the town and whatnot. He was far from being a rookie officer. But yes, technically, because he was in his first few months of employment at Pineville, he was technically on their initial probationary period. Let me ask one follow-up question to that. Was there any evidence as to the policies and protocols that exist for that particular police department for this kind of situation? No, Your Honor. Okay. Well, there was evidence of, in the record, that the police department conducted an inquiry and said their procedures were followed. All right. Your Honor is right. Yes, there was an internal investigation. We did not even tender that or put that in the record. That was put in by the plaintiffs and their opposition in the district court. Just laying it all out there. And yes, Judge Niemeyer is correct. I'd forgotten that. All right. Thank you, Mr. McClatchy. Thank you, Your Honor. Mr. Littlejohn. Yes, Your Honor. So, you know, we just spoke for a moment about the manner of which the gun was held. It would be the appellant's position, again, to not over-complicate things, but it's a question of fact regarding the grip on the gun, whether or not Mr. Carroll was pointed towards officers. Can I suggest something? Yes, Your Honor. When you're looking at the qualified immunity, don't we have to look at the reasonable perception of, or the actual perception of, the officers confronting the situation and assess whether that they reacted reasonably? In other words, to reconstruct the whole incident is not the effort, I don't think. I think the effort is to find out whether the police reaction was unreasonable. And in that regard, we have to decide whether there is any dispute as to the police reaction. In this case, in particular, Griffin and Roberts. And so both Griffin and Roberts were facing a man with a gun. And whether, how it was pointed or whatever it was, you start getting to the question of does a gun have to be fired? Does it have to be aimed right at you? I mean, we've never held officers to that kind of standard. They're trying to do their job. And so if you're going to focus on a dispute, you probably need to focus on whether they, their perception, is disputed. Yes, Your Honor. And I would start following that with the evidence that we put forward. Number one, per Scott V. Harris, U.S. Supreme Court case, you know, the evidence with the position of the appellees are contradicted by the BWC. If you watch the BWC, you do not see Mr. Carraway pointing a gun at officers. And again, these emphases are supposed to be drawn in the light most favorable to Mr. Carraway. But I guess the, but of course, the district court did make that finding. And Mr. McClatchy says there's evidence to support that. But then the district court also said that it didn't matter whether or not your client pointed the gun at anyone. Once the gun came out, given all that had transpired before then, that it was reasonable for the officers to react in the way they did, that is to respond with deadly force. So I guess you need to address that. Right. And so, and in that moment, from after the initial gunshot, and again, we are not conceding that the initial gunshot was lawful, but in that moment, the moment he fell, he fell to the ground like a sack of potatoes, Officer French states, he states in the record that, okay, guys, we need to be done. We need to be done at this point. That is the reason why Officer French did not shoot whatsoever. So what you're saying, counsel, is that reasonableness is essentially, on most circumstances, a question of fact. Yes, your honor, because it would not be reasonable to shoot a man who does, who is now unarmed. It is on, it was on record that Mr. Carraway had dropped the gun as soon as he was first fired, and officers continued to shoot at him 11 more times, striking him. And you know, after he had initially failed face prone, prone position, so face down to the ground, he was unarmed at that, at that time. In three and a half seconds, they're supposed to make that determination. In three and a half seconds is, the Waterman case tells us what is reasonable force in one second may not be reasonable force in the next second. Officer French, who was the closest one to him, who only saw a cell phone, who never shot. And again, there were two officers on the scene who did not shoot. It's undisputed that he had a gun, and he pulled the gun out. The gun was near his hand when he was on the ground. The mere possession of a gun is not enough to use this type of force. I know, but you just said they, I mean, the officers maybe could have reacted also with respect to the cell phone, except that, that isn't what they were reacting to. They were reacting to an actual gun, and they perceived it to be aimed in their direction. Again, which is, we would put forth as contradicted by the BWC, and... Why is it contradicted? Because if you, if you watch the BWC... I saw it myself on the film. And so, Your Honor, you know, on that point, and I only have about 13 seconds here, Mr. Carraway was not handling the weapon, you know, in a, in a threatening manner. It would... How do you, what evidence do you have to say that for? Who's testified to that? Mr. Carraway testified that he never pointed a weapon, that he attempted, that he had complied with law enforcement. You have two, you have an officer on scene who stated he, he did not, he, he never raised it. As far as I remember, he didn't bring it up to shoot. The same officer stated that when asked, did it appear that he pulled... You're talking about Officer French? Yes, sir, Your Honor. We're talking about Griffin and Roberts. Right, but... They're at a different angle, they're different positions. Griffin is 70... Tell me what they saw. Griffin is 75 feet away. He is the furthest, and he cannot see the right side of Mr. Carraway. He cannot see a weapon in Mr. Carraway's hand. He, he cannot determine, and he stated that he did not know after, he, he did not shoot Mr. Carraway until after he was on the ground, and he continued to shoot. I think that isn't supported either. I mean, a gun, a gunfire is basically simultaneous. It's a 3.5 second burst. There is a dispute as to which gun Roberts or, or Griffin's gun fired first, but they fired simultaneously for 3.5 seconds, and it was all over. He was on the ground. When it started, he was in a kneeling position with the gun in the right hand. And with nothing Your Honor, I am over my time. Go ahead, go ahead. And can you ask the question again? I'm sorry. I was just wondering. I'm just saying when the gunfire started, he was in a kneeling position with a gun in the right hand. No, Your Honor, because the investigative report in the record states that he, Mr. Mr. Carraway had already fallen to the ground when he was... Well, there's a film picture of him at 50 seconds with him kneeling and the gun in his hand at .50. All right. Thank you. Thank you. Thank you, Your Honor. Thank you both for your arguments. We'll come down and greet you and adjourn for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Albert Diaz, Paul V. Niemeyer, Rossie David Alston Jr.